**Thomas KIRSCHNER, Plaintiff-Appellee,**

v.

**Paul BROADHEAD, James B. Brumfield, and John Robinson, M.D., Defendants-Appellants.**

Nos. 80–2530, 80–2542 and 80–2543.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 28, 1981.

Rehearing and Rehearing En Banc Denied April 28, 1982.

---

David M. Mattingly, Samuel A. Fuller, Donald L. Tunnell, Yarling, Tunnell, Robinson & Lamb, Indianapolis, Ind., for defendants-appellants.

William L. Soards, Soards & Carroll, Indianapolis, Ind., for plaintiff-appellee.

Before BAUER, and WOOD, Circuit Judges, and CAMPBELL,* Senior District Judge.

BAUER, Circuit Judge.

Thomas Kirschner sued defendants-appellants Paul Broadhead, James Brumfield, and John Robinson for damages allegedly stemming from a fist-fight and name-calling incident. The first count of Kirschner's complaint charged all three appellants with assault and battery; the second count accused Broadhead of slander. The jury returned a verdict in favor of Kirschner for $90,000 on the first count and $50,000 on the second. On appeal Broadhead, Brumfield, and Robinson argue that reversible errors occurred in the proceeding below. We agree and reverse the judgment of the district court.

I

The incident giving rise to this lawsuit was the culmination of a series of irritating confrontations between two Canadians—Kirschner and Robert Suwary—and three Mississippians—Broadhead, Brumfield, and Robinson. All five attended several social events hosted by Mel and Brenda Simon in Indianapolis, Indiana over the 1975 Memori-

---

* The Honorable William J. Campbell, Senior Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

al Day weekend. Stating the matter mildly, the two groups did not part friends by the holiday's end.

The first brouhaha involving members of the two groups occurred at the Simons' residence on Friday afternoon, May 23, 1975. Appellant Robinson and his wife arrived at the Simons' home and went to the bar area where they mingled with other guests. Kirschner, who had just completed a tennis match, entered the bar pounding his chest yelling, "I'm Tarzan! I can beat anybody." The Robinsons considered Kirschner's display unseemly, but apparently chose to suffer in silence.

The next episode in the saga unfolded that evening at the LaTour Restaurant, where the Simons held a dinner party in honor of Actor Ernest Borgnine. Appellants Robinson and Broadhead, together with their wives and two other couples, were seated in the restaurant's cocktail lounge engaged in conversation when Kirschner's friend Suwary approached them. Suwary pulled up a chair and seated himself so close to Broadhead that their faces were just inches apart. He then intentionally annoyed Broadhead by staring at him. Robinson, who happens to be Broadhead's physician, fearing that Suwary's provocation would aggravate Broadhead's seriously high blood pressure,[1] asked Suwary to leave. Robinson and Suwary then left the table and exchanged words in a nearby alcove. At that point, Kirschner walked past the alcove and noticed Robinson and Suwary arguing. According to Robinson, Kirschner intervened and began poking Robinson in the chest while calling him offensive names. Robinson responded by grabbing Kirschner and either pushing or punching him. The fray ended, however,

when an obviously peace-loving waiter separated them.

The following morning, Kirschner and Suwary allegedly continued their antics by loudly criticizing the fare at an elaborate champagne brunch. In fact, Robinson testified that Kirschner went so far as to spew food from his mouth to his plate.[2] That afternoon Suwary interrupted a tennis match, in which Broadhead was a participant, by walking on the court and arguing with Broadhead. Still later, during an evening dinner dance at the Broadmoor Country Club, Kirschner and Suwary accosted Robinson's wife with an extremely rude and indelicate remark.[3]

Given the mounting tension between the Kirschner-Suwary and Robinson-Broadhead factions, the melee which occurred a few hours later could hardly be termed a surprise. At 1:30 a.m. Sunday morning, Kirschner and Suwary returned to the Marten House Hotel, where both they and the appellants were staying. Suwary, walking a few feet ahead of Kirschner, passed the doorway to a room in which Broadhead, Robinson, and Brumfield were watching television. Broadhead spotted Suwary and headed for the door. After reaching the door and starting down the hall in pursuit of Suwary, Broadhead glanced in the opposite direction, saw Kirschner trailing behind, and said, "Come over here, boy. I want to talk to you." Kirschner turned to escape but ran into Robinson and Brumfield as they emerged from the television room.

Although the evidence is conflicting as to exactly what followed, it appears that Kirschner swung at Robinson, who ducked and dropped to the floor, the blow striking Brumfield instead. Brumfield returned the favor by punching Kirschner, who fell on

---

1. In his deposition, Broadhead described his medical problems in some detail. He stated that he had high blood pressure for over 20 years, ultimately suffering a heart attack in August of 1975. After recovering from the heart ailment, he experienced nose bleeding that necessitated hospitalization for approximately ten days, during most of which time he was unconscious. These problems were followed by depression and anxiety and, then, arm and hand disorders.

2. According to Broadhead's deposition, Suwary behaved in a like manner. We gather that either Broadhead confused Suwary's actions with those of Kirschner, or Suwary and Kirschner both engaged in the same crude conduct.

3. The rude comment possibly was provoked by an incident earlier in the evening when Robinson and Broadhead taunted Kirschner about facial injuries received during his scuffle with Robinson the night before.

Robinson. A struggle ensued, with Kirschner getting the worst of it.[4] Somehow Kirschner broke free and fled to the hotel lobby, where he found Suwary. Shortly thereafter, Broadhead arrived in the lobby shouting, "These guys are a bunch of goddamn queers, a bunch of homosexuals." It is unclear whether anyone other than Suwary and Kirschner was present at the time Broadhead made these statements. In any event, the police were called and the combatants separated.

Kirschner subsequently brought this action, alleging assault and battery based on the fracas outside the television room and defamation based on Broadhead's exclamations in the lobby. This appeal challenges the substantial judgment awarded Kirschner.

## II

Appellants first contend that the trial court erroneously excluded portions of Broadhead's proffered deposition testimony. Kirschner introduced portions of Broadhead's deposition in which Broadhead acknowledged calling Kirschner and Suwary "queers" and possibly homosexuals. Appellants subsequently attempted to place Broadhead's statements in context by presenting the remainder of his deposition testimony. The trial judge, however, ruled that the rest of Broadhead's answers were unresponsive and therefore inadmissible.

Appellants argue that under rule 32(d)(3)(B),[5] Fed.R.Civ.P., Kirschner waived his right to object at trial to the narrative form of Broadhead's answers by failing to so object during the deposition. Kirschner, on the other hand, claims that no waiver occurred and that, in any event, the testimony was properly excluded at trial on either hearsay or relevancy grounds.

We agree with appellants. Rule 32(d)(3)(B) is plain on its face: errors or irregularities in the form of answers which might be obviated during the deposition if promptly presented *are waived* absent timely objections. *See, e.g., Oberlin v. Marlin American Corp.*, 596 F.2d 1322, 1328 (7th Cir. 1979); *Bahamas Agricultural Industries, Ltd. v. Riley Stoker Corp.*, 526 F.2d 1174, 1180 (6th Cir. 1975); *Sims Consolidated, Ltd. v. Irrigation and Power Equipment, Inc.*, 518 F.2d 413, 417 (10th Cir.), *cert. denied*, 423 U.S. 913, 96 S.Ct. 218, 46 L.Ed.2d 141 (1975); *Elyria-Lorain Broadcasting Co. v. Lorain Journal Co.*, 298 F.2d 356, 360 (6th Cir. 1961); *Thompson v. Thompson*, 164 F.2d 705, 706 (D.C.Cir.1947); *Houser v. Snap-On Tools Corp.*, 202 F.Supp. 181, 188 (D.Md.1962).

The analysis in *Bahamas Agricultural Industries*, 526 F.2d 1174, 1180–81 (6th Cir. 1975), is instructive on this point. There, as here, the deponent was unavailable to testify at trial, necessitating the introduction of his deposition testimony. The deponent had been asked a number of argumentative questions by plaintiff's counsel without objection by defendant. The trial court sustained several of defense counsel's objections to the form of the deposition questions. On appeal, the Sixth Circuit held that the district court erred in sustaining the objections because defendant had not raised them during the deposition. We find the Sixth Circuit's reasoning persuasive and worth repeating:

> If the objection could have been obviated or removed if made at the time of the taking of the deposition, but was not made, then that objection is waived. The focus of the Rule is on the necessity of making the objection at a point in the proceedings where it will be of some value in curing the alleged error in the deposition. When a party waits until trial to

---

4. Kirschner's version of the incident differs from that of appellants' in two respects. First, he never admitted striking the initial blow. Second, he claims all three appellants attacked him, not just Robinson and Brumfield.

5. Rule 32(d)(3)(B) provides:
Errors and irregularities occurring at the oral examination in the manner of taking the

deposition, in the form of the questions or answers, in the oath or affirmation, or in the conduct of parties and errors of any kind which might be obviated, removed, or cured if promptly presented, *are waived unless seasonable objection thereto is made at the taking of the deposition.* (Emphasis added).

object to testimony in the deposition, the only manner in which to cure the deposition is to bar the objectionable portions from the trial. It is important that objections be made during the process of taking the deposition, so that the deposition retains some use at the time of trial; otherwise counsel would be encouraged to wait until trial before making any objections, with the hope that the testimony, although relevant, would be excluded altogether because of the manner in which it was elicited.

*Id.* at 1181. Although the issue before the Sixth Circuit concerned only the form of questions, the court noted that rule 32(d)(3)(B) applies to questions and answers alike. *Id.* at 1180.

■ After reviewing the colloquy between the trial judge and counsel for both sides, it is clear that the district court excluded Broadhead's deposition testimony as unresponsive even though Kirschner failed to object to this testimony at the time of its taking. The court's failure to admit this testimony kept the jury from hearing Broadhead's version of the weekend conflict because illness precluded him from testifying at trial. This result is precisely what rule 32(d)(3)(B) is designed to prevent: a total exclusion of evidence on grounds which could have been remedied at deposition but cannot be at trial. Clearly, any problem with the form of Broadhead's deposition answers could have been corrected by seasonable objection. Broadhead simply would have conformed his answers to the questions. The limited nature of such answers, in turn, would have alerted Broadhead's counsel to develop omitted portions of the story on cross-examination. Because Kirschner did not object, appellants very properly considered Broadhead's in depth narrative sufficient for their purposes and thus dispensed with questions of their own. Having failed to raise the responsiveness issue during Broadhead's deposition, Kirschner cannot do so at trial. Were we to

hold otherwise, we would encourage the tactics condemned in *Bahamas Agricultural Industries.*

Kirschner's argument that the district court properly excluded portions of Broadhead's deposition because the testimony was hearsay or irrelevant also fails. First, neither of these grounds were relied upon by the trial court. Even if they did form the basis for the trial court's rulings, we could not uphold such rulings on appeal. Rule 32 (d)(3)(A),[6] Fed.R.Civ.P., provides that if relevancy objections could have been obviated if presented at the deposition, failure to so object operates as a waiver. *See Cordle v. Allied Chemical Corp.,* 309 F.2d 821, 825–26 (6th Cir. 1962); *Dudding v. Thorpe,* 47 F.R.D. 565, 570 (W.D.Pa.1969). Kirschner easily could have interposed relevancy objections during Broadhead's deposition. Had he done so, appellants would have been prompted to elicit relevant testimony favorable to their positions, such as Broadhead's description of what occurred immediately before and during the fight. Thus, relevancy objections could have been cured.

In any event, there is no such problem because the excluded testimony was relevant. The testimony in question described the circumstances surrounding the weekend events, including Kirschner's actions and Broadhead's state of mind. In a civil suit for assault and battery, defendants who assert self-defense—as did Brumfield, Robinson, and possibly Broadhead—put in issue the reasonableness of their conduct, which is normally a jury question. In making its determination, the jury is obligated to consider the victim's conduct and the reasonableness of the defendants' apprehension of harm. Both Brumfield and Robinson clearly claimed self-defense, thereby placing in issue the conduct of the victim, Kirschner. Since Kirschner's behavior was an issue, Broadhead's description of it and the context of events in which it occurred was plainly relevant. Hence, Broadhead's depo-

---

**6.** Rule 32(d)(3)(A) provides:

Objections to the competency of a witness or to the competency, relevancy, or materiality of testimony are not waived by failure to make them before or during the taking of the deposition, *unless the ground of the objection is one which might have been obviated or removed if presented at that time.* (Emphasis added).

sition should have been admitted over Kirschner's relevancy objections.

Finally, few if any of Broadhead's answers concerned out of court statements subject to the hearsay rule. Rather, his testimony consisted largely of describing events he observed or in which he participated. The total exclusion of Broadhead's testimony was therefore improper.

## III

■ Although our analysis thus far is dispositive of this case, we feel compelled to comment on several other matters. First, the trial court erred in admitting Dr. Schacter's deposition testimony to establish that the battery might have caused Kirschner to suffer recurring headaches. The question put to Dr. Schacter was whether such headaches could conceivably have resulted from the blows Kirschner received during the battery, to which Dr. Schacter merely replied "yes." However, Dr. Schacter also testified that clinical neurological examinations indicated Kirschner's brain functions were normal. In addition, Dr. Schacter noted that a diagnosis of brain concussion and resultant headaches is strictly based on the past history provided by the patient, unless a doctor actually examines the patient at the time of the injury. In short, Dr. Schacter could not independently assess Kirschner's past headache experience, if any, nor could he state with any reasonable degree of medical certainty whether Kirschner's continuing headaches stemmed from the battery. Based on this and similar testimony by Dr. Noyek,[7] Kirschner attempted to establish his alleged permanent injuries.

The Indiana Supreme Court recently addressed a nearly identical situation in *Palace Bar, Inc. v. Fearnot*, 269 Ind. 405, 381 N.E.2d 858 (1978). Fearnot's wife brought a wrongful death action against Palace Bar and Herman Walters, the tavern's owner-manager, alleging in substance that their negligence caused Fearnot to fall which, in turn, caused Fearnot to suffer a fatal heart attack. The only testimony in support of this theory, however, was the expert medical opinion of one doctor that a heart attack killed Fearnot. After stating that any number of events, some of them unrelated to defendants' negligence, could have caused decedent's heart attack, the doctor noted that there was no way of knowing which of these possibilities actually happened to the point of being a medical fact or conclusion. *Id.* at 414, 381 N.E.2d at 864.

Because the doctor's opinion was the only testimony linking defendants' negligence to Fearnot's heart attack, the testimony assumed critical importance as proof that defendants' negligence could have caused Fearnot's death. The Indiana Supreme Court considered the testimony too speculative for presentation to the jury. The *Palace Bar* court reasoned that a

> doctor's testimony can only be considered evidence when he states that the conclusion he gives is based on reasonable medical certainty that a fact is true or untrue. A doctor's testimony that a certain thing is *possible* is no evidence at all. His opinion as to what is possible is no more valid than the jury's own speculation as to what is or is not possible. Almost anything is possible, and it is thus improper to allow a jury to consider and base a verdict upon a "possible" cause of death.

*Id.* (emphasis in original). Thus, the mere possibility of a causal relationship, without more, was insufficient to qualify as an admissible expert opinion.

The admissibility of an expert medical opinion, of course, should not turn on whether the testifying physician characterizes a particular potential cause of an injury as "conceivable," "possible," or "probable." *See Trapp v. 4–10 Investment Corp.*, 424 F.2d 1261, 1268 (8th Cir. 1970). Regardless of the term employed, if the physician's

> testimony is such in nature and basis of hypothesis as to judicially impress that the opinion expressed represents his professional judgment as to the most likely

---

7. According to Dr. Noyek, it was impossible to determine whether Kirschner's permanent partial hearing loss was a pre-existing condition unrelated to the fight because Dr. Noyek had never examined Kirschner for hearing loss prior to this incident.

one among the possible causes of the physical condition involved, the court is entitled to admit the opinion and leave its weight to the jury.

*Norland v. Washington General Hospital,* 461 F.2d 694, 697 (8th Cir. 1972) (per curiam). Nevertheless, a mere possibility is not an affirmative basis for a finding of fact. "In the language of the law of evidence, [a medical opinion suggesting] that which is merely possible, standing alone and not offered as auxiliary or rebuttal testimony, is immaterial to the ascertainment of the fact and so is inadmissible as evidence of that fact." *Martin v. United States,* 284 F.2d 217, 219 (D.C.Cir.1960).

Under the standards laid down in either the Indiana or the federal decisions, it is obvious in this case that Dr. Schacter's testimony as to the "conceivable" cause of Kirschner's alleged headaches was speculative and, thus, inadmissible. In no way did Dr. Schacter suggest that the blows Kirschner received were anything more than one of many possible causes of recurring head pain or permanent hearing loss. Dr. Schacter completely failed to assess the relative probability of such a relationship. Absent this connection, admitting his testimony allowed improper speculation by the jury that appellants were somehow responsible for Kirschner's subsequent ill health.

█ In addition to the foregoing evidentiary problem, three of the instructions given by the trial court were erroneous. Instruction 25 directed the jury to consider, among other things, whether Kirschner's supposed injuries were permanent and whether they impaired his ability to pursue his business. Along the same lines, instructions 27 and 28 counseled the jury to contemplate whether Kirschner should be compensated for any future pain and suffering and future damages. Appellants entered timely objections to these instructions.

During the pretrial conference, the trial court specifically asked Kirschner's attorney whether Kirschner was abandoning his claim for future loss of earnings. Kirschner's counsel responded that that was Kirschner's intention. Thus, there apparently was no claim for diminished future earnings, and, therefore, no instruction should have been given.

Moreover, Kirschner's own testimony revealed that Kirschner did not experience reduced earnings in most of the years following the fight. In 1975, the year of the incident, he earned approximately $17,000. In 1976 that amount rose to nearly $30,000, remained at about $20,000 in 1978, and was as high as $35,000 in 1980. Apart from his low salary of $10,000 in 1979 that resulted when he changed jobs, the only year Kirschner lost money was 1977. Clearly, the proof necessary to support the diminished future earnings instruction was woefully inadequate. And as we already have demonstrated, Kirschner adduced no competent evidence regarding permanent injuries. Hence, instruction 25 should not have submitted these matters for the jury's consideration.

█ Instructions 27 and 28 suffer from similar defects. No proof of continuing pain and suffering was offered to support instruction 27. Likewise, no evidence was offered concerning future damages. It is prejudicial error for a trial court to give instructions which find no support in the evidence, unless the record shows the error is clearly harmless. *See Wright v. Farmers Co-op of Arkansas and Oklahoma,* 620 F.2d 694, 697 (8th Cir. 1980); *Harris v. Chesapeake and Ohio Railway Co.,* 358 F.2d 11, 14 (7th Cir. 1966). The huge verdict in Kirschner's favor for injuries sustained during a simple fist fight with apparently minimal injuries suggests the manifest prejudice of giving such instructions.

### IV

For the reasons expressed in this opinion, the jury's verdicts on count I and count II are reversed. The cause is remanded for a new trial in accordance with the views expressed herein.

Reversed And Remanded.